All right, our final case this morning is 23-8024 Saddletree Holding v. Evanston, Ms. Olson. May it please this very honorable court and co-counsel, or opposing counsel, Mr. Mosley. My name is Anna Olson and I am appearing today on behalf of Saddletree Holdings, LLC. I'm also appearing today on behalf of my former co-counsel, Ronald Schmidt, who sadly and very unexpectedly passed away a few months ago. This was his brief and I'm here to argue that for him. I know he was desperate to be here today and so I would like to rely primarily on his brief and just highlight the issue that I believe is most important. And this issue regards the unreasonableness of the two-year contractual time period for filing suit against Evanston. Do you feel like he had made that argument in his briefs to us? I do, Your Honor. Maybe not the way I would have done that. And really before I dive into that argument, I would also acknowledge that Mr. Schmidt raised arguments of waiver, which were not raised below. And I don't believe should be considered by this court because I don't think that issue has been preserved. However, with that said, we all know that the underlying policy provided for a two-year filing suit date from the date of loss. The date of loss in this case occurred in January of 2019 after a large snowstorm. Unfortunately, Saddletree was unable to realize the substantive loss because of the snow. And so he didn't really realize there was even a loss until May of 2019. The claim was then submitted to Evanston with the senior claim suggester, Harvey Goodman. Mr. Goodman hired the engineer, Rimkus, to investigate the matter and determine what the cause of loss was. By this point, it's now seven months after the cause of loss, and so Saddletree has already lost seven months to file suit. Rimkus determined that the cause of the loss was the negligent construction of the building combined with the weight of the snow. That was given to Mr. Goodman, and Mr. Goodman denied the claim, saying that while the policy does not provide for loss on negligent construction. And that was submitted to the insured. However, I believe it is important to note that in doing that, the insurance company made no mention of additional coverage in explaining the loss. So two months later in September of 2019, Saddletree's attorney asks Markel for the Rimkus report. And this, I believe, is very important. Mr. Goodman denies giving the insured the Rimkus report because he states it's against our protocol to give you our engineer's report. What is important about this statement is that it's false. There is no protocol prohibiting the insurance company from providing the insured with the engineer's report. Well, you had your own engineer report, correct? Yes, we did, Your Honor. We did, from Mr. Albertson. However, that report, if you look at it carefully, it states that the building collapsed due to negligent construction, which is not in dispute. But it did not mention that the reason why it collapsed was also because of the weight of the snow. And that's what was important. That's what triggers coverage under Section D of the policy. But isn't it also true that Saddletree, when it asked for the report in September 2019, said it wasn't contesting the denial claim and that it was asking for the report to facilitate a suit against Dreams? Yes, Your Honor. Thank you for bringing that up. I don't know why Mr. Durant said those things. It's possible he didn't know that there was a potential claim against the insurance company because we didn't have the Rimkus report to tell us that the weight of the snow is what caused the collapse. However, I humbly submit that that statement does not excuse the misrepresentation that the engineer's report couldn't be provided because of the protocol that does not really exist. Did they have a duty to produce the report? Well, Mr. Durant said they did and said that he had discussed... So does the law say they had a duty to produce the report? Right. Well, that issue was not discussed before the district court. I always wanted to make the argument, I always believed, that the insurance company must act for the benefit of its insured. And when we were told that there was a protocol prohibiting the release of the report, we took them at their word for it and didn't dispute it and come forward with law saying that you needed to produce this report. So, tragically, the Rimkus report was not disclosed to Saddle Tree until eight months after the contractual time period had lapsed. Then there was additional discussions with the insurance company regarding whether the collapse of the building was abrupt and whether there was coverage under subsection D. When Evanston finally denied the claim again for a second time, that was in December of 2021, and three months after that, a suit was filed. So, I argued to the district court that the two-year time period was unreasonable because of her statements in Judge Friedenthal's statements in Thompson v. Protective Insurance Company. She held that a two-year time period is unreasonable when filing a suit, and we also argued that Evanston should be stopped from asserting the two-year time period because you cannot benefit from your own wrong. When they deliberately and intentionally make a false statement that they cannot disclose the Rimkus report because of a protocol that doesn't exist, they shouldn't be entitled to benefit from that. Do any of the Estoppel cases involve a contract limitations period? Your Honor, I believe they did, and I know that this circuit, in the cases that I've read from this circuit, the circuit is very clear that contractual time periods are valid and they do apply, and unfortunately, this court has also held that a shorter time period of even one year applies. But at least in the District of Wyoming, the district court has applied an Estoppel argument, and it's just a basic common law maxim that one cannot benefit from his or her wrong. And because we claim that Evanston benefited by withholding this report from us for well over 20 months, they should be stopped from asserting this contractual time period. Can I ask you, I don't mean to interrupt you, but what if we were to say, okay, well, Evanston, you cannot benefit from your wrongful statement about your protocol. So when Mr. Bagley had said that the building, that the accumulation of stofol had caused this caving in, you can't, you're to stop from arguing that, okay? But what about the other arguments with regard to additional coverage? For example, the provision that says that the additional coverage provision doesn't kick in because the building and all of its parts are still standing. And I raised that issue to the district court and cited many, many cases about collapse and standing. And I believe, and I think this was accepted by the district court, that simply because a building is, quote, unquote, standing, if it cannot be used for its intended purpose, it has been considered to be collapsed or a cave-in. And there are many cases that say even a six-inch downward deviation, if the building can no longer be used for its intended purpose, can be said to have collapsed. And that's what I maintain to the district court. Unfortunately, we didn't even get to that issue because of the contractual time period. But I would love to see this case reversed so I can pursue that with Judge Friedenthal, although she's retiring, sadly. But with your leave, I would be seated. Thank you. Lisa, we're not getting the clock on the screen. I don't know how to fix that. Would you like me to call someone? Pardon me? I don't know how to fix that. Would you like me to call someone? Okay, well, just raise your hand when we're down to five minutes and raise it again when there's zero. How much time did she have left? She has four minutes and 43 seconds. Okay. As long as you're getting it, just let me know when the clock expires. Okay. Good morning. My name is Jeremy Mosley, and I represent the Appalese, Evanston, and Markell. May it please the Court. This property insurance appeal results from plaintiff's belated attempt to claim that a building that is still standing today actually collapsed back in 2019. The undisputed facts confirm that plaintiff's claim, the contract claim, is too late, first of all. Second of all, that Evanston reasonably investigated the claim by hiring and relying on an independent engineer. And third, that plaintiff has no damages related to any alleged bad faith conduct by the defendants. The District Court correctly evaluated these issues, determined them under Wyoming law, and this Court should affirm. As background, in 2014, plaintiff's owner, Mr. Gose, hired one company to pour a foundation. He hired the Dream Carport Company to construct a building, and then he added drywall and insulation. It's undisputed by every engineer who's looked at this that the building design is defective. It was defective from the beginning, and the building was not designed in a way that it could withstand its own weight, much less the weight of any snow load that it would be required to under building code. That means even if this building were built in Arizona, over time, it was still going to start to sag, and that's what happened only five years after it was built in the winter of 2019. Now, plaintiff claims the building was damaged as a result of snow in January 2019, but he didn't report the claim until May. Once the claim was reported, Evanston and Markell sent an engineer who provided an opinion and a report. That engineer met with Mr. Gose on site and told him and left with a distinct impression. Everyone understood the condition of the building, and then Evanston and Markell provided their denial letter because the cause of loss was the result of a defective building. That was July of 2019. So from the time that Evanston learned of this loss, it was reported May 6, 2019, until the end of July when they provided a letter providing their opinion. That's less than three months. So the question of whether a contractual limitations period is reasonable, they're certainly enforceable if they're reasonable. The district court correctly determined it was reasonable. Now, I would disagree with opposing counsel because I don't believe the reasonableness of the time limit was raised on appeal. It was raised to the district court and rejected, but it was not raised on appeal and therefore doesn't need to be considered in terms of the reasonableness. If the court does consider the reasonableness, it is. It's reasonable. It's two years. It was a three-month investigation, and what the district court specifically looked at was the fact that it's not a situation where the insurer essentially runs out the clock, let's keep looking at it, and then says at the end, oh, it's not covered, leaving the insured in a position of it's time to sue, and now they think they need to sue, and it's too late. The time's already run out. That didn't happen here by any means. It was a three-month investigation. There was still a year and a half left to be able to sue under the two years, and in fact, as the district court also found, it didn't prevent, nothing stopped the plaintiff from filing the lawsuit. They just didn't file it against Evanston. They didn't file it against their insurance company where there was no coverage. Instead, their counsel at the time agreed there was no coverage and sought to bring a claim against the manufacturer of the building. They obtained a $2.2 million judgment, a default judgment against that builder that they are still working to collect. Last we knew. So there was nothing that conduct by Evanston or the defendants prevented the plaintiff, Saddletree, from pursuing any remedy, including if they had at the time disagreed with Evanston and decided they wanted to bring a claim. One of the things raised just now about that timing was then the fact, of course, that the report was not provided, and I want to clear up some things from the record. The record specifically says that the attorney asked for that report so that they could bring a claim against somebody else and said, we agree with your decision to deny the claim. Now we're going to go against someone else and we'd like to use your engineer's report, meaning this, we agree the claim is over. We're not challenging it, but we want to take the investigation, the materials that you used to evaluate insurance coverage, and now we want to take it and use it against somebody else instead. Well, if you have an obligation to provide the material that the insurer used in order to deny the claim, why does that obligation disappear based on the insurer's purpose in using it? Well, first of all, there's not an obligation. You don't have an obligation to provide the insured with on request for information that the insurer used in order to deny the claim? No, there's no obligation to turn over your claim file. There's no obligation to do that. You have an obligation to provide the basis for your opinion or your decision and why, which was the letter, which explained everything. So that letter was required and the detail in that letter, in terms of the basis for denying a claim, but there's simply no legal duty. There's no insurance regulation. There's no statute. There's no case law that requires it. The lower court agreed that there was no duty earlier in the case in dismissing the other defendants that had been sued. So I take it then that you would contest characterization that there was a misrepresentation about whether the policy could be turned over? Well, absolutely contest the factual record that's been presented in terms of what was actually said to the insured. And what I mean is this. The adjuster did not respond to the insured and say, we have a protocol, we're not giving it to you. All they said was, I'm sorry, we can't comply with your request. There was an internal email where a discussion was had about whether to turn it over. And one of those people, who was not opposed in this case, said it's against our protocol to turn it over. When asked at deposition, the adjuster, Mr. Goodman, said, I don't know what he's referring to because we do this on a case-by-case basis. And in this case, that meant getting legal counsel and having the legal department review the request. And then the decision was made by the adjuster to not provide the report when it had been requested in that context. So there was no misrepresentation of a policy. What was said to the insured at the time was, we're not going to comply with your request. The corporate representative of Evanston was later deposed and he provided the reason for that. And it was exactly what we've talked about. It's a case-by-case basis. And when they are not even challenging our decision, and the whole reason is to use that report to go bring a claim against a third party, we did not turn it over in that context. We made that decision. Really, they need to go get their own engineer to pursue that claim, which they did. The other thing I want to point out that's different is Mr. Albertson's report that they then went and got from him actually says the building didn't collapse. Their own expert, their own engineer, said this is not a collapse. And he says, thankfully, it's not a collapse. It wasn't until two years later when there was a change in legal strategy and a change in plan to make this into a collapse case under the insurance policy that he writes a supplemental report and says, well, actually, my opinion is there was some type of zip-like collapse that had happened back then. Did Judge Friedenthal find that there was a collapse? She did not. She essentially said, I don't have to go there because the contractual limitations period has run, and since there's no contract claim that can be pursued, I don't need to make that coverage determination. And the thing is, collapse is actually an open question under Wyoming law, what it takes to establish that. Judge Friedenthal has a prior case, the Wandler case, in which she had analyzed collapse. And in doing so, she said there's these two different tests, and I don't need to decide which one will apply in Wyoming or under Wyoming law because under either one, it fails. But that's the latest we have, if you will. Now, in Wyoming, there is the Navani case out of the New Mexico District Court in which Judge Matheson and Judge Simkovich both affirmed what Judge Brack of the District Court did there in determining that, based on very similar policy language to what we have here, there's no collapse. I mean, this would be a potentially fundamentally different appeal if we went into the issue of coverage overall that the District Court didn't do. There's no reason to because the contractual limitations period passed and was reasonable. But if we did, then this court would need to decide which test actually applies under Wyoming law and then apply that test. Now, I submit to you, just like in the Navani case, the test must be one that accounts for all the words in the policy, such as it can't apply to a building that is actually still standing and only has bending, bulging, and things of that nature. And when you take a survey of collapse cases across the country, there are many jurisdictions that really just don't consider any of that language. And whether it's not even in the opinion, they don't even address it, or whether in some cases they say, well, I don't know about that, maybe it's ambiguous. A couple cases have done that. But there's a stronger line of cases, if you will, such as Navani, that say in this court, affirming saying that this was not an ambiguous policy in Navani, to say this is not ambiguous, it's clear. This is what's required for collapse. A building that's in danger of collapse has not collapsed. A building that's still standing has not collapsed. And that's part of why when Markell and Evanston, the adjuster, looked at this claim, he didn't cite to language that he looked at and said doesn't apply. He told them this is a defective design, there's no coverage. He didn't go through the policy and say, well, someone might say this applies, but since I don't think it does, let me tell you about it and why it doesn't. And that's not a reasonable... The building didn't fall down, but it's not usable for its intended purpose. Well, but that depends. So here's the thing. The engineer actually said, we have seen what a certain snow load has done to this building, and it has withstood that. It's damaged, but it didn't collapse, it didn't fall down. The engineer actually got on the roof and walked on this building. You don't do that if you're worried about the building falling down. Well, I don't. I don't think an engineer does that. There's some crazy adjusters out there. He's the engineer, not the adjuster. But wait, it's a little different. So the engineer has looked at this and said it didn't collapse, and it's not in danger of falling down. But what he did say was, be careful in the snowy months, because essentially if it gets more snow load than we already know it can handle, then that could be a problem, because we've got a defectively designed building. Well, you said earlier that even if it were in Arizona, it's at risk of caving in. So I don't think you'd want to use a building in that condition as an event center. Well, no. You shouldn't in the way it was built in the first place. But in terms of did it change as a result of this storm, and now in a way that you can tie it to a covered event, you can't. It didn't change. It had this fundamental flaw that existed from when it was built that still exists today, and it's still standing as well. It could be a house of cards type building, but you can also have a snow or weather event that would collapse it, that would generate coverage. So it seems like depending on how we interpret those provisions, they conceivably could apply here. You could. You could have had a snow event that had so much snow it actually collapsed the building, but you didn't. What you had was a building that deflected. And there's an argument about whether it was immediately or something that occurred over time that the district court didn't get into as well. But the fact of the matter is the stronger case law, I said that unlike the Nibani case, is that this provision would say that there's no coverage even for a collapse. But this court doesn't need to go to – pardon me, there is no coverage here because there wasn't a collapse. The court here doesn't need to go there because this court instead should find the two-year provision contractual limitation is reasonable and Evanston should not be stopped from relying on it because they did not misrepresent anything. They simply said we're not going to give you the report in the context of there being no law, no insurance regulation, and no other duty to provide that report. And particularly when the request was, I want to use that report to sue someone else. The final thing I'll point out, Your Honor, is procedural bad faith. There are no damages related to procedural bad faith. The arguments essentially come in a circle right back to saying, well, but if we had coverage, then here's the damages we have. But Mr. Gose said in his deposition, he agreed he had no idea what he would have done differently if he had received the report in 2019 instead of receiving it in 2021. That's not only relevant to estoppel, it's relevant to bad faith. There is no causation related to any of that alleged bad faith conduct. This court should affirm. Thank you. Thank you, counsel. We are getting the screen now. Just briefly, Your Honors, the only reason why the building has not collapsed into a pile of rubble into the ground was because shortly after Mr. Bagley came out there and looked at it, the insurance, I'm sorry, the insured put in some temporary shoring, which has prevented the building from completely falling to the ground. The temporary shoring has damaged the heating in the floor, and so it can no longer be used as a community building, which is what its intended purpose was. I think it's also interesting to note that Mr. Bagley, in his report, said that this building, in its current condition, should not be used ever. Not in the summer, not in the winter. He didn't get up and walk around it. I don't know why he did that, but he ultimately concluded that it should not be used in its current condition. So it's also notable that despite the fact that Evanston knew that the building was dangerous, shouldn't be occupied by anybody, they did not tell the insured that. They have the obligation to be truthful and honest with the insured, and they deliberately withheld that information until the contractual two-year time period had lapsed. Thank you so much for your time and attention to this case. I'm very grateful. Thank you, Counsel.